FILED

2021 Sep-20  AM 09:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **BRANDON GIPSON**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:20-CV-00403-CLM** |
| | ) | |
| **CITY OF ANNISTON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

The Calhoun County District Attorney's office charged Brandon Gipson with the capital murder of Antonio Billingsley. Prosecutors eventually dropped the charges but not before Gipson spent 29 months in jail. Gipson now sues the City of Anniston; Shane Denham, the Anniston Chief of Police; the City of Oxford; Bill Partridge, Oxford's Chief of Police; Calhoun County; Larry Amerson, the Calhoun County Sheriff; Brian McVeigh, Calhoun County's District Attorney; Bruce Butterworth, an officer of the Calhoun County Sheriff's Department; Christopher Grier, an Anniston police officer; and Barry Billingsley, an individual.

The court dismissed Gipson's claims against Billingsley in a separate order (doc. 58). The remaining Defendants also seek dismissal of the claims against them.

Gipson brings claims of malicious prosecution, failure to supervise, inadequate training, denial of due process, civil conspiracy, and deliberate indifference under 42 U.S.C. § 1983. Gipson also brings a claim for the tort of outrage under § 1983, which the court construes as an intentional infliction of emotional distress claim brought under Alabama law. And Gipson's response brief suggests that he is bringing his failure to supervise, inadequate training, and civil conspiracy claims under both § 1983 and Alabama law.

In short, here are Gipson's claims and the remaining Defendants against whom he brings the claims:

- Count I – Malicious Prosecution
    - Anniston
    - Oxford
    - Calhoun County
    - McVeigh
    - Denham
    - Partridge
    - Amerson
    - Butterworth
    - Grier

- Count II – Failure to Supervise
    - Anniston
    - Oxford
    - Calhoun County
    - McVeigh
    - Denham
    - Partridge
    - Amerson

- Count III – Inadequate Training
  - Anniston
  - Oxford
  - Calhoun County
  - McVeigh
  - Denham
  - Partridge
  - Amerson

- Count IV – Denial of Due Process
  - Calhoun County
  - McVeigh
  - Denham
  - Partridge
  - Amerson
  - Butterworth
  - Grier

- Count V – Civil Conspiracy
  - Calhoun County
  - McVeigh
  - Denham
  - Partridge
  - Amerson
  - Butterworth
  - Grier

- Count VI – Deliberate Indifference
  - Calhoun County
  - McVeigh
  - Denham
  - Partridge
  - Amerson
  - Butterworth
  - Grier

- Count VII – Outrage
  - Calhoun County
  - McVeigh

- o Denham
- o Partridge
- o Amerson
- o Butterworth
- o Grier

For the reasons stated below, the court will **DISMISS WITH PREJUDICE** Gipson's § 1983 claims against Anniston, Oxford, Calhoun County, and the individual defendants in their individual capacities. The court will **DISMISS WITH PREJUDICE** the official capacity § 1983 claims against Denham, Grier, and Partridge. The court will **DISMISS WITHOUT PREJUDICE** the § 1983 official capacity claims against Amerson, Butterworth, and McVeigh and all of Gipson's claims for equitable relief. Because the court is dismissing all claims over which it has original jurisdiction, the court declines to continue to exercise supplemental jurisdiction over Gipson's state law claims. So the court will **DISMISS WITHOUT PREJUDICE** any state law claim that Gipson asserts.

## STATEMENT OF ALLEGED FACTS

Law enforcement arrested Brandon Gipson in Rochester, New York in February 2015. Doc. 37 at 5. During Gipson's initial court appearance in New York, the court informed him of a probation violation from Calhoun County, Alabama. *Id.* Gipson knew nothing about it. The authorities then transported him to Anniston. Doc. 37 at 6. When he arrived, officers questioned Gipson about the February 2015 murder of Antonio Billingsley. *Id.* Gipson denied any involvement in the murder.

4

*Id.* The next day, the officers arrested Gipson charging him with capital murder and attempted murder. *Id.*

The Calhoun County court held a preliminary hearing in April 2015. During this hearing, Officer Grier from the City of Anniston Police Department testified that a confidential informant gave information that led to Gipson's arrest. *Id.* Officer Grier testified that the confidential informant was a reliable source and available for the case. *Id.*

A grand jury then indicted Gipson for both capital murder and attempted murder. Doc. 37 at 6. About a month later, Gipson had his initial court appearance for the murder charges and for a separate charge from Calhoun County dating to 2011. *Id.* During this court appearance, Gipson pleaded not guilty to all charges and maintained that he did not kill Antonio Billingsley. Doc. 37 at 7. After his denial of any involvement in the murder, officers returned Gipson back to Calhoun County Detention Center with no bond. *Id.*

Over the next several months, Gipson requested discovery and filed several discovery related motions. *Id.* But he struggled to get the defendants to comply and his issues resolved. *Id.* As a result, the parties conducted multiple hearings in relation to the discovery material and evidentiary procedures. *Id.* During one of these hearings, Officer Butterworth (from the Calhoun County Sheriff's Department) testified about receiving the confidential informant's tip about Gipson. *Id.* But

Officer Butterworth could not remember any specifics about this call including the time, date, place, or phone he used. Doc. 37 at 8. Officer Butterworth eventually admitted that this call was "an alleged tip." *Id.*

During another hearing, the District Attorney's office "promised" to provide all discovery material. *Id.* at 7. But months passed without this happening. *Id.* Gipson argues that the defendants did not timely send important evidence that would prove his innocence and contradict the investigation's findings. According to Gipson, the 911 call from the night of the murder, the State Cell Tower Expert report, and a video recording from a location close to the murder scene were either untimely sent or not produced. Doc. 37 ¶¶ 17, 20-22. Roughly three years after Gipson's indictment, the court dismissed his case. *Id.* at 9.

In total, Gipson had at least four or five hearings over roughly three years to try to receive all the requested evidence and discovery to prove his case. *Id.* At each hearing, Gipson requested information from the Anniston and Calhoun County investigation files and told the investigating officer to reexamine the evidence. *Id.* He specifically requested information on his alleged probation violation, and many pieces of crucial evidence such as the 911 call recording, the Cell Tower report, and the video from a location near the crime scene, that he never received or were untimely sent. Doc. 37 ¶¶ 17, 20–22. Gipson argues that if the defendants had timely produced and properly examined the evidence and monitored and properly trained

the officers, he could have earlier proved his innocence and reduced his punishment time. So he now sues the defendants.

## STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, the court must take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 8 does not require "detailed factual allegations," but does demand more than "an unadorned, 'the-defendant-unlawfully-harmed-me' accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. *Id*. The complaint's assertions must find support through further "factual enhancement." *Id*.

Rule 12(b)(6) requires dismissal when a complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A complaint states a facially plausible claim for relief when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* This standard of plausibility asks for more than a "sheer possibility" that a defendant acted unlawfully. *Id.*

## ANALYSIS

Gipson sues the individual defendants in both their individual and official capacities. The court will first address Gipson's § 1983 claims against Anniston, Oxford, Calhoun County, and the individual defendants in their individual capacities. The court will then address Gipson's § 1983 claims against the individual defendants in their official capacities. Finally, the court will explain why it will not continue to exercise supplemental jurisdiction over Gipson's state law claims.

### I. The court will dismiss the individual capacity § 1983 claims and the § 1983 claims against the municipalities/Calhoun County.

Gipson fails to address several arguments that the defendants make for why the individual capacity § 1983 claims fail. Failure by a plaintiff to address arguments raised by a defendant's brief results in abandonment of the related claim. *See, e.g.*, *Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n.2 (11th Cir. 2009); *Stewart v. City of Homewood et al.*, No. 2:19-CV-00955-AKK, 2019 WL 5696183, at *2 (N.D. Ala. Nov. 4, 2019). Because Gipson fails to respond to several grounds for dismissing the individual capacity claims, the court finds that Gipson has abandoned his individual capacity § 1983 claims.

To be safe, the court will also explain alternative grounds for dismissing each of the § 1983 claims against each defendant.

### A.  McVeigh has prosecutorial immunity from the § 1983 claims.

Calhoun County District Attorney McVeigh argues that prosecutorial immunity bars the § 1983 claims against him. *See* Doc. 46 at 6. Any conduct by a prosecutor "intimately associated with the judicial phase of the criminal process" calls for prosecutorial immunity. *Van de Kamp v. Goldstein*, 555 U.S. 335, 342–43 (2009). This includes conduct related to training and supervising deputy district attorneys and failing to turn over exculpatory evidence. *Id.* at 342, 347. Prosecutors are also "immune for malicious prosecution." *Hoffman v. Office of the State Atty.*, 793 F. App'x 945, 950 (11th Cir. 2019).

Gipson's allegations against McVeigh are that he intentionally prosecuted Gipson with no credible evidence against him; withheld exculpatory evidence; did not reasonably review the evidence in Gipson's file; and failed to properly train/supervise the assistant district attorneys. These are the exact type of allegations that prosecutorial immunity protects against. So the court will dismiss all the § 1983 claims that Gipson brings against McVeigh in his individual capacity.[1]

---

[1] To the extent that Gipson has named as a defendant the "District Attorney's Office of Calhoun County," a district attorney's office is not a legal entity subject to suit under § 1983. *See Harris v. Elmore Cty. D.A. Office*, 2013 WL 1084294, at *1 (M.D. Ala. Jan. 30, 2013). So the court will dismiss any claims Gipson is bringing against that entity.

**B.      The § 1983 claims against Calhoun County fail.**

Though Gipson names only Calhoun County as a defendant, he brings his malicious prosecution claim against the Calhoun County Sheriff's Department. Regardless of which entity is being sued, Calhoun County argues that the court should dismiss Gipson's claims because (a) the Calhoun County's Sheriff's Department is not a legal entity that Gipson can sue, and (b) the County is not responsible for the Sheriff's Office or its employees.

1. Sheriff: "Under Alabama law, a county sheriff's department lacks the capacity to be sued." *Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992). So Gipson cannot bring his claims against the Sheriff's Department. And in Alabama, sheriffs are executive officers of the state, so "a sheriff is not an employee of a county for the purposes of imposing liability on the county." *See Turquitt v. Jefferson Cty.*, 137 F.3d 1285, 1288 (11th Cir. 1998). In other words, sheriff's officers "act on behalf of the State, rather than the county, when acting in their law enforcement capacity." *See McMillian v. Monroe Cty.*, 520 U.S. 781, 789 (1997).

2. The County: Gipson's malicious prosecution claim explicitly seeks to hold Calhoun County liable for actions of its Sheriff's office. And Counts II and III of Gipson's complaint seeks to hold Calhoun County liable for failing to adequately supervise or train Officer Butterworth. Counts IV and V each allege that Calhoun County, acting in concert with Butterworth, tampered with evidence and interfered

with the administration of justice. Count VI faults Calhoun County for creating an atmosphere that "has resulted in a pattern or practice of conduct by Calhoun County police officers that deprives personal rights privileges and immunities secured or protected by" both federal and state law. Doc. 37 ¶ 97.

But Gipson's complaint contains no allegations that Calhoun County exercises control over the supervision and training of Sheriff's Department employees. Nor does Gipson plausibly allege that Calhoun County employees, rather than Sheriff's Department employees, tampered with evidence, interfered with the administration of justice, or created an atmosphere that led Calhoun County police officers to deprive him of his constitutional rights. Instead, the allegations against Calhoun County in Counts IV–VI are merely conclusory assertions that do not pass muster under *Twombly*. Finally, Gipson cites no legal authority that would contradict Calhoun County's contention that it is not responsible for the acts of the Calhoun County Sheriff or his deputies. The court has found none. As a result, the court will dismiss Gipson's § 1983 claims against Calhoun County.

### C.   Amerson and Butterworth are entitled to qualified immunity.

Amerson, the Calhoun County Sheriff, and Butterworth, a Calhoun County Sheriff's Officer, each seek qualified immunity on the individual capacity § 1983 claims against them. Qualified immunity protects government officials from being sued in their individual capacities so long as "their conduct 'does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eleventh Circuit applies a two-part test to determine whether a government official is entitled to the defense of qualified immunity. "First, the official must prove that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Second, if the official meets that burden, the plaintiff must prove that the official's conduct violated clearly established law." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (citations omitted).

1. Scope of discretionary authority: Amerson and Butterworth both claim to have acted within their discretionary authority. The court agrees. The only specific claim Gipson makes against Sheriff Amerson is that he "negligently failed to adequately train and supervise Defendant officers in Calhoun County in the area of policy procedure, arrest procedure, and investigations." Doc. 37 ¶ 48. And Gipson's claims against Butterworth all stem from passing along information to the Anniston police department from an alleged confidential informant who was a mere tipster.[2] These acts are reasonably related to Amerson and Butterworth's jobs as Calhoun

---

[2] Gipson's deliberate indifference claim (Count VI) also alleges that Butterworth failed to train, supervise, and discipline other Calhoun County officers. Doc. 37 ¶ 97. That count also alleges that Butterworth failed to implement policies that would lead to an adequate investigation of misconduct by officers. *Id.* But Gipson's well-pleaded factual allegations do not plausibly suggest that Butterworth has either supervisory or policymaking authority. So these allegations fail to state a claim upon which relief can be granted.

County Sheriff and Calhoun County Sheriff's Officer. So Amerson and Butterworth acted within the scope of their discretionary authority.

2. Clearly established law: The burden thus shifts to Gipson to show that these officials violated clearly established law. *See Harbert*, 157 F.3d at 1281. A right may be clearly established in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement or principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (internal citations omitted).

Gipson's response brief (doc. 49) doesn't challenge Amerson's assertion of qualified immunity, much less point the court to precedent that clearly establishes that Amerson's actions were unlawful. So the court will dismiss the § 1983 individual capacity claims against Amerson on qualified immunity grounds.

Gipson's brief also fails to specifically reference Butterworth's qualified immunity defense. But he does cite *Navarette v. California*, 572 U.S. 393 (2014), for the proposition that it is clearly established that different standards apply to information received from an anonymous tipster than information received from a confidential informant. Though unclear, Gipson appears to argue that *Navarette* required Butterworth to corroborate the anonymous tip before passing it along to the

Anniston police department.

*Navarette* is a case that discusses when it is unconstitutional to institute an investigatory stop based on an anonymous tip. *See id.* at 397–98. As the Supreme Court explained, "under appropriate circumstances, an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop," but it isn't usually enough. *Id.* at 397 (quotations omitted). In his reply brief, Butterworth correctly points out that the facts of *Navarette* differ from the facts alleged here, which are: (1) that Butterworth passed along an anonymous tip to the agency investigating Antonio Billingsley's murder; (2) that although Butterworth tried to follow up on the tip, he did not succeed; and (3) that Butterworth misled the other officers by describing the anonymous tip as coming from a confidential informant when it didn't.

Courts aren't "to define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quotations omitted). Instead, "[a] government official's conduct violates clearly established law when, at the time of the alleged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates the right." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1146 (11th Cir. 2017). And *Navarette*, which again involves investigatory stops, wouldn't have put Butterworth on notice that (a) he needed to corroborate the anonymous tip before passing it along

to the officers investigating Billingsley's murder, and (b) that he had to tell those officers that the tip came from an anonymous tipster, not a confidential informant. So Gipson hasn't met his burden to show that Butterworth's actions violated clearly established law. The court will thus grant Butterworth qualified immunity on the individual capacity § 1983 claims.

### D.     Grier is entitled to qualified immunity.

Grier, an Anniston police officer, argues that he is also entitled to qualified immunity. Under the qualified immunity standard discussed above, Grier has shown that he was acting within the scope of his discretionary authority when he investigated Gipson and testified at Gipson's preliminary hearing. So the burden once again shifts to Gipson to show that Grier's actions violated clearly established law. *See Harbert Int'l*, 157 F.3d at 1281. But Gipson's response brief doesn't reference Grier's qualified immunity defense. Nor does he point to any precedent that would suggest that no reasonable officer would have acted as Grier did.

Instead, Gipson's response brief only briefly addresses his malicious prosecution and due process claims against Grier. And Gipson's response doesn't address the other § 1983 claims against Grier at all. When discussing his malicious prosecution claim, Gipson merely reasserts his allegations that Grier failed to follow up on information from Antonio Billingsley's mother and falsely testified at the preliminary hearing that the information tying Gipson to Billingsley's murder came

from a confidential informant. He doesn't cite any case law, much less case law that establishes beyond debate that Grier violated his constitutional rights.

In any event, these allegations don't show that "every reasonable official would have understood" that Grier's actions violated Gipson's constitutional rights, *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018)—particularly when Gipson doesn't allege that Grier ***knew*** that the information Butterworth relayed to him came from a tipster, not a confidential informant. Instead, Gipson alleges only that Grier relied on false information from Butterworth and Barry Billingsley to conclude that Gipson murdered Antonio Billingsley and then failed to follow up on evidence that suggested otherwise.

Gipson's other argument for why Grier violated his constitutional rights is that Grier withheld evidence from him. But "investigators have no duty to disclose exculpatory and impeachment evidence to the defense." *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996). They instead must only turn over this evidence to prosecutors. *See id.* In addition, a plaintiff must allege "more-than-negligent conduct" to state a § 1983 claim against an officer for failing to turn over exculpatory material. *See Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007).

Gipson doesn't allege that Grier failed to turn over any relevant evidence to prosecutors. Gipson in fact asserts that prosecutors had access to the discovery he requested but failed to share it with him. Even if he had alleged that Grier failed to

give prosecutors exculpatory information, Gipson could only state a viable due process claim if he also alleged facts that showed that more than inadvertence caused Grier to withhold the evidence. And Gipson hasn't done so. So Gipson has failed to establish that Grier violated the law, much less clearly established law, by withholding exculpatory evidence. The court will thus grant Grier qualified immunity on the individual capacity § 1983 claims against him.

### E.    Gipson doesn't state a § 1983 claim against Denham.

Anniston Chief of Police Denham asserts that the court should dismiss the § 1983 claims against him because Gipson is impermissibly seeking to hold him vicariously liable for the acts of his subordinate (*i.e.*, Grier). Supervisors are liable under § 1983 "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (internal quotations omitted). A causal connection can be established by "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.*

Though Gipson names Denham as a defendant in each count of his complaint, he only makes specific allegations against Denham in two paragraphs:

> 10.    The Chief of Police Shane Denham for the City of Anniston Police Department at the time of the violations detail[ed] in this complaint.

> The Chief of Police was the Commanding Officer of the Defendant Officer Christopher Grier ("Grier") and was responsible for training, supervision and conduct.

> 44.   Chief Denham negligently failed to adequately train and supervise Defendant [O]fficer Grier in the area of policy procedure, arrest procedure, and investigations. With regards to failure to train and supervise Defendant's exhibited reckless disregard for deliberate indifference to Plaintiff.

Doc. 37 ¶¶ 10, 44. The court can't hold Denham liable for merely being Grier's commanding officer and having responsibility for Grier's training and supervision. *See Keating*, 598 F.3d at 762. And the allegations made against Denham in ¶ 44 are the type of naked assertions and conclusory allegations that *Twombly* says this court cannot accept as true when ruling on a motion to dismiss.

Gipson responds that he has alleged facts that Denham "was aware or at least should have been aware of the misconduct of [his] officers." Doc. 47 at 11–12. But those allegations don't appear in Gipson's amended complaint. And the court must judge Gipson's complaint as pleaded; Gipson cannot use his brief in opposition to amend it. *See Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009). In any event, the bare assertion that Denham "was aware or at least should have been aware" of Grier's misconduct is another conclusory statement that isn't entitled to the assumption of truth. So the court will dismiss the individual capacity § 1983 claims against Denham.

**F.    Gipson's municipal liability claims against Anniston fail.**

Anniston contends that "Gipson does not provide a single factual allegation that would support municipal liability under § 1983." Doc. 47 at 14. The court agrees.

"A municipality is liable under § 1983 where an official policy causes a constitutional violation." *Walker v. City of Calhoun*, 901 F.3d 1245, 1255 (11th Cir. 2018) (quotations omitted). And two things count as municipal policies: (1) an officially promulgated policy, or (2) "an unofficial custom or practice" that is "shown through the repeated acts of a [municipality's] final policymaker." *Id.* In other words, plaintiffs establish municipal liability by showing that their constitutional harm resulted from a municipality's "acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *See id.* (quotations omitted).

Gipson's factual allegations against Anniston and its employees focus exclusively on Grier's allegedly inadequate investigation into Gipson. He does not cite a specific policy that he says led to this inadequate investigation. Nor do Gipson's well-supported factual allegations suggest that Anniston had a pattern of investigating others in the way that Grier investigated Gipson. Instead, Gipson's complaint includes only these conclusory allegations against Anniston:

54.   Defendant Anniston failed to monitor the activities of Grier and failed to properly train and supervise their activities and conduct.

68.   Defendant City of Anniston negligently failed to adequately train and supervise Defendant Officer[ ] Grier in the area of policy procedure, arrest procedure, and investigations. With regards to train and supervise Defendant[ ] exhibited reckless disregard for and deliberate indifference to Plaintiff.

81.   Defendants City of Anniston and Grier denied the Plaintiff due process by concealing their behavior and tampering with evidence pertinent to his criminal defense and interfering with the administration of justice in violations of Plaintiff['s] civil rights as guaranteed by the United States Constitution.

88.   Defendants City of Anniston and Grier acting in concert conspired to suppress the unwarranted and unlawful conduct of the Defendant Officers by tampering with evidence and proffering same to be used in a judicial tribunal. Said conspiracy was entered into with the specific intent to cover up the violation of Plaintiff's civil rights.

95.   Defendant City of Anniston and Grier have created an atmosphere of tolerance regarding willful, and improper behavior of officers. Through their acts and omissions they engaged in a pattern [and] practice of systematic deficiencies that has resulted in a pattern or practice of conduct by Anniston police officers that deprives personal rights[,] privileges[,] and immunities secured or protected by the U.S. Constitution[,] the laws of the United States[,] and the Alabama Constitution and laws of Alabama. The systematic deficiencies include but are not limited to[:]

   (a)   failing to train Anniston Police Officers adequately to prevent occurrence of misconduct;

   (b)   failing to supervise Anniston Police Officers adequately to prevent the occurrence of misconduct;

   (c)   failing to implement policies and procedures whereby complaints and other allegations of officers' misconduct are adequately received and investigated;

(d)     failing to adequately investigate incidents[;]

(e)     failing to adequately discipline officers who engage in misconduct.

Doc. 37 ¶¶ 54, 68, 81, 88, 95.

Without pleading facts that would support these conclusory assertions, Gipson has failed to show that his alleged harm resulted from an official policy promulgated by Anniston. Nor does Gipson identify a final policymaker for Anniston. Even if Denham counts as a final policymaker, the court has already explained that Gipson's allegations against Denham are either conclusory assertions or simply that Denham was responsible for Grier's training. These allegations fail to establish that Denham's repeated acts created an unofficial custom or practice that harmed Gipson. So the court will dismiss Gipson's § 1983 claims against Anniston for failing to adequately plead municipal liability.

### G.    Gipson doesn't state a § 1983 claim against Partridge.

Oxford Police Chief Partridge asserts that Gipson hasn't adequately pleaded facts that would suggest that he has supervisory liability under § 1983. According to Gipson, Oxford police officers, who reported to Partridge, violated his constitutional rights by: (1) being involved in the initial investigation of Antonio Billingsley's murder; (2) interviewing several witnesses, including possible suspects, and failing to follow up; (3) learning about information relevant to Billingsley's murder but not presenting it; and (4) withholding evidence. *See id.* ¶¶ 60–61. Like with Denham,

21

though Gipson names Partridge as a defendant in each count, he only makes specific

allegations against Partridge in two paragraphs:

> 11.  The Chief of Police Bill Partridge for the City of Oxford Police Department at the time of the violations detail[ed] in this complaint. The Chief of Police was the Commanding Officer of the department and was responsible for training, supervision[,] and conduct.

> 46.  Police Chief Partridge negligently failed to adequately train and supervise Defendant officers of the Oxford Police Department in the area of policy procedure, arrest procedure, and investigations. With regards to failure to train and supervise Defendant's exhibited reckless disregard for deliberate indifference to Plaintiff.

*Id.* ¶¶ 11, 46.

As explained when discussing Gipson's § 1983 claims against Denham, these

allegations fail to state a supervisory liability claim against Partridge. And Gipson

has alleged no facts that would suggest that Partridge personally participated in the

investigation into Antonio Billingsley's murder. So the court will dismiss the

individual capacity § 1983 claims against Partridge.

**H.  Gipson's municipal liability claims against Oxford fail.**

Like Anniston, Oxford argues that Gipson has failed to adequately plead

municipal liability under § 1983. As with Partridge, Gipson's claims against Oxford

stem from allegations that Oxford police officers interviewed several witnesses to

Billingsley's murder, including possible suspects, but withheld evidence and failed

to follow up. But Gipson asserts no facts that would suggest that an officially

promulgated Oxford policy caused the officers to conduct this allegedly inadequate

investigation. Nor do the facts alleged show that the repeated acts of Partridge created an unofficial custom or practice that led to a shoddy investigation into Billingsley's murder. Instead, Gipson makes the same conclusory allegations against Oxford as he made against Anniston. So for the same reasons why Gipson's § 1983 claims against Anniston fail, his § 1983 claims against Oxford also fail. The court will dismiss the § 1983 claims against Oxford for failing to adequately plead municipal liability.

## II.  The official capacity claims against the municipal officers are duplicative and the court lacks jurisdiction over the other official capacity claims.

Having dismissed the individual capacity § 1983 claims against the individual defendants, the court now turns to the official capacity § 1983 claims against them. Different standards govern official capacity claims against municipal officers than those that govern official capacity claims against state officials. So the court will first discuss the official capacity claims against Denham, Grier, and Partridge, who are municipal officers, and then turn to the official capacity claims against McVeigh, Amerson, and Butterworth, who are state officials.

### A.  The official capacity claims against Denham, Grier, and Partridge are duplicative.

Denham and Grier are municipal officers for the City of Anniston, and Partridge is a municipal officer for Oxford. "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer

is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quotations omitted).

So Gipson's official capacity claims against Denham, Grier, and Partridge "are

functionally equivalent" to his claims against Anniston and Oxford. *See Busby v.

City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Indeed, it is redundant to have

both a city and its officers sued in their official capacities as defendants. *See id.* This

redundancy means two things: (a) the official capacity claims against Denham,

Grier, and Partridge should be dismissed as duplicative, and (b) the official capacity

claims against Denham, Grier, and Partridge fail for the same reasons why the

§ 1983 claims against Anniston and Oxford fail. So the court will dismiss the official

capacity § 1983 claims against Denham, Grier, and Partridge.

### B.   The court lacks jurisdiction over Gipson's official capacity § 1983 claims against McVeigh, Amerson, and Butterworth.

Unlike Denham, Grier, and Partridge, McVeigh, Amerson, and Butterworth

aren't municipal officers; they work for the State. *See Williams v. Monroe District

Atty.*, 702 F. App'x 812, 813 (11th Cir. 2017) ("An Alabama district attorney is a

state employee."); *Tinney v. Shores*, 77 F.3d 378, 383 (11th Cir. 1996) ("Under

Alabama law, both sheriffs and deputy sheriffs are considered executive officers of

the state."). It doesn't look like Gipson is seeking monetary damages from McVeigh,

Amerson, and Butterworth in their official capacities. *See* Doc. 37 at 32 (requesting

compensatory and punitive damages only "against each of the individual Defendants

and the City Defendants in their ***individual capacities***" (emphasis added)). But if he

is, Eleventh Amendment immunity bars claims for monetary damages against state employees acting in their official capacities. *See Williams*, 702 F. App'x at 813–14.

Whether the Eleventh Amendment bars the § 1983 claims for equitable relief against McVeigh, Amerson, and Butterworth in their official capacities is trickier. But, in any event, it's clear to the court that Gipson lacks standing to bring his claims for equitable relief. *See AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007) (noting that courts must "consider standing *sua sponte* even if the parties have not raised the issue").

To determine standing, the court looks for three things: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994).

But Gipson has alleged no facts that would suggest that he is still being investigated or is facing future prosecution for the murder of Antonio Billingsley. Nor has Gipson asserted that he is now suffering any adverse effects from being previously charged with capital murder. Instead, Gipson has only shown that he suffered *past* harm from the capital murder charges. And "[p]ast exposure to illegal

conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Church*, 30 F.3d at 1337 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). So Gipson doesn't "have standing to seek prospective relief even if he has suffered a past injury." *See 31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003).

If Gipson is seeking to bring his equitable claims on behalf of others, he hasn't shown that he can do so. *See Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994) (noting the general prohibition against third-party standing). The doctrine of third-party standing lets a party assert the rights of others only if (a) there is a close relationship between the parties, and (b) there is a "hinderance" to the third party bringing the claims on his own behalf. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Gipson has not shown that he has a close relationship with others currently being investigated/prosecuted in Calhoun County or that those individuals can't sue on their own behalf. So Gipson doesn't have standing to bring his claims for equitable relief.

In short, the Eleventh Amendment bars Gipson from seeking monetary damages against McVeigh, Butterworth, and Amerson in their official capacities. And Gipson doesn't have standing to pursue injunctive relief. So the court will dismiss the official capacity § 1983 claims that Gipson brings against McVeigh, Butterworth, and Amerson for lack of jurisdiction.

### III.   The court declines to continue to exercise supplemental jurisdiction over the state law claims.

Gipson's remaining claims all arise under state law. And Gipson hasn't shown that the court has original jurisdiction over these claims, so the court has discretion whether to exercise supplemental jurisdiction over them. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004).

The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Id.* at 1089. The court feels particularly encouraged here because whether Gipson has stated viable state law claims likely turns on thorny issues of Alabama law, such as state-agent immunity. These state law issues are best left for state courts to decide. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726–27 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals."). So the court will dismiss Gipson's state law claims without prejudice under 28 U.S.C. § 1367(c).

## CONCLUSION

For these reasons, the court will **GRANT** the motions to dismiss (docs. 40, 42, 43, 45) as follows. The court will **DISMISS WITH PREJUDICE** Gipson's § 1983 claims against Anniston, Oxford, Calhoun County, and the individual defendants in their individual capacities. The court will **DISMISS WITH PREJUDICE** the official capacity § 1983 claims against Denham, Grier, and Partridge. The court will **DISMISS WITHOUT PREJUDICE** the § 1983 official capacity claims against Amerson, Butterworth, and McVeigh and all of Gipson's claims for equitable relief. Because the court is dismissing all claims over which it has original jurisdiction, the court declines to continue to exercise supplemental jurisdiction over Gipson's state law claims. So the court will **DISMISS WITHOUT PREJUDICE** any state law claim that Gipson asserts.

Further, the court previously told Gipson that the court was "not inclined to grant leave for [Gipson] to file a second amended complaint" after the court granted him two extensions and 52 days to respond to the defendants' original motions to dismiss. Doc. 36. The court holds to that position; it will not grant Gipson a second chance to cure his pleading deficiencies, especially when he knew that the defendants would raise these defenses because they had done it before. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("Repeated failure to cure deficiencies by amendments previously allowed" is sufficient reason to dismiss a complaint).

The court will enter a separate order that carries out this ruling.

**DONE** on September 20, 2021.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE